The court now resumes its session. Good morning again. All right, I'll be calling the cases in the order that they are listed. The next case for argument is Saad Sayad v. Garland. Good morning. May it please the court, my name is Cori Hong. I'm from the Florence Project. I represent Petitioner Hamad Saad Sayad, whom I will refer to as Mr. Sayad. I will reserve two minutes for rebuttal and I will watch my time. I will talk about due process, credibility, and then CAT. First on the due process claim, the government does not dispute that competent interpretation is fundamental to a full and fair hearing. The government also did not dispute that both at the hearing and at the asylum interview this record has indicia that all three types of the Perez-Lassor interpretation problems existed. First, there were direct errors in the hearing itself. The father's rank in the military was, although it was a brigadier general, was initially interpreted to be guard. His stroke was initially interpreted to be blood clot. And smile was translated to be metal object, large stick. And according to the Mr. Chamo's declaration, never the true word semil. Second, there's evidence that Mr. Sayad did not understand the interpretation at the hearing and at the interview. Counsel, can I just ask a question? Because I think you do point out some translation issues perhaps. What I was struggling with is where's the prejudice here? Did any of these actually impact? Because we have this all the time where there might be some mistranslations or misunderstandings. But at the end of the day, you need to show that it impacted something. Is there something in the credibility finding that you think the due process claim came to play? Yes. And there are two pathways to the prejudice. The more narrow pathway is by the Nahwin-Dinobi case, which is the best pathway for that. Where there, in that case, there were three reasons to find the Nigerian individual not credible. The court didn't uphold the adverse credibility, but also in the due process said that only two of those three errors actually were tied to translation problems. Here, what we have, the first two translation problems are speculation, but the third one was the question about the dates. And at the hearing, he said it was 2015-2018. The prejudice comes from the interview, the asylum interview. Because at the asylum interview, he testified that he was gone from 2015 to 2018. He testified he returned on November 18, and also he testified that he didn't remember. What we have then is the problem with the asylum transcript. At 12.02, the asylum officer says that there were three different interview dates, December 31st, January 6th, January 14th. We only have the initial transcript from December 31st, which was just half an hour, and then we only have one transcript from January 14th. And what's notable, Your Honor, at 12.20, we have notes from the superior directing the asylum officer to ask follow-up questions. And those follow-up questions were integrated in the entire singular transcript from January 14th. Well, but the BIA seemed, and the IJ interpreted him, his testimony before the IJ as saying that he was taken away the day he got back to Yemen. Was that his testimony? Never. That day, the day that he came back, was simply from the INS officer's closing testimony. That is, that closing testimony was at 3.48, where the DHS attorney says his testimony on that day was, I think, literally the day that he returned in 2018. He himself, at 2.09 and 2.10, was simply asked the date. He just said he returned to Yemen. And on cross-examination, as recited in the government brief, your testimony was that you returned in November 2018. There is no specificity whether he returned to his family house or returned to Yemen. Was he given a chance to try to address this claimed inconsistency? It was, no, because it wasn't an inconsistency until the DHS closing argument misremembered that testimony to exist. So he was, it was never identified by the DHS in real time, it was never identified by the IJ in real time, and it only came up in the closing argument and, again, in the IJ decision. So that is an issue where TEKLA, where there actually is no true inconsistency. So if the Court prefers just to deal with the adverse credibility finding, that is the stickiest point in that there is plenty of case law and plenty of record to show that there was not, in fact, an inconsistency on his dates. If the Court prefers just to look at the adverse credibility, the other two grounds that were given are pure speculation. Can I make sure I understand that? Because I thought there was an inconsistency when, in the credible fear interview, he said he came back in 2017, and then later he said it was November of 2018. Your Honor, I'd ask that you actually read the transcript because this is where the BIA can't cherry-pick dates. And what happens at 2000, at 12-14, he identifies the date to be 2014 to 2017, but at 12-17 and 12-18, he twice says he returned in 2018 and then again in November 2018. And this is where I think the superior notes, which is a very rare addition, at 12-20, there the superior, when he's asking, going through the follow-up questions, never had a concern, and the superior assumed that his return date was November 2018. So this is a situation where the transcript shows that there actually is not a true date, and even so — Well, but I guess — I just want to make sure I understand it, because it seems to me that he did give two inconsistent statements, but there wasn't — your argument is there wasn't clarification sought as to, wait, what do you mean? You said 2017 here, you said 2018 here. Can you help clarify that? Exactly. Because you don't disagree that he said 2017 in one place and he said 2018 in another place. Yes. In this — and under the REAL ID Act, the court looked at the totalitarian circumstances, and the 2014-2017 is from the reconstructed notes of the asylum office, and he himself did not have problems with those different dates. He found him credible. The superior reviewing and telling him to ask follow-up questions never found that to be a problem. He assumed it was 2018. But the — and then the only — and under Bhandari, this court says we only care about to the timeline of events and persecution, and the BIA said, of course, this is material because it was the day that he attacked. But that testimony, the day that he came back, is from the DHS closing argument. There is nothing in the record of Mr. Syed saying that he was captured on the day he returned. Okay. How about the piece of this about the agency discrediting his account of having contact with his father? Yes. On that issue, Karouni is the best case, where this court says it is not unreasonable for a person to risk their own safety to see a dying father. This is particularly true because he fled for Saudi Arabia in 2014 after his father was captured. He came back to Saudi Arabia in 2018, and after his return, he was then tortured. Unlike Loho, which is the case that the government cites, too, he never went back to Yemen after his torture. He never left the United States. So that is pure speculation by the BIA that somehow a senior dying father undercuts his own fear. The second reason that the government gave, or the final reason that he gave for finding him not credible, is that Mr. Syed should have known how his neighbors learned about his father's stroke. That is pure speculation. Mr. Syed did not lie because he refused to speculate how his neighbors came across that information, which he did not have personal account of. So this is under Rahimi v. Barr and Kumar. This Ninth Circuit case law says that the BIA is not allowed to base an adverse credibility on speculation alone. Can I ask about the demeanor? Because the BIA did, albeit it was thin, but they did uphold the IJ's finding that his demeanor was, you know, sort of shifty, he was looking at his notes, and that was one of the four or multiple bases for adverse credibility. What do we do with that? Your Honor, I did not read the BIA to accept the demeanor credibility. I thought there was one sentence in there where they sort of commented on, let's see, let me see if I can pull it up. So you, but you agree that the IJ relied on... The IJ did. Correct. But you don't think that, your position is the BIA did not rely upon that, the demeanor? Yes, there were multiple reasons that the IJ gave that the BIA did not accept. No, I understand that. I thought there was one sentence in there. I'll try and pull it up. I think you're right. It does say briefly, in discussing the IJ's decision, it references the demeanor. But did not expressly uphold it, and I think there are a couple reasons why that, again, that would go to the due process argument quite well, a nice capture that if, I mean, there were so many problems, and what's unique about this record is that there was a certified translator in the courtroom who twice at the beginning of the interview, of the hearing, interrupted the judge and said, he's speaking a different dialect. He can't understand the truth. Can I go back to one other part of the father's story? There was another line in the BIA decision, an IJ decision, that talks about, well, we are sort of disbelieving that he hasn't had contact with his father since 2014 because there are these documents like the passport and the medical records that he possesses. Can you address that? Yes. So that went on the corroboration piece, which if the court agrees with the credibility, that falls out altogether. But on those two issues of corroboration, the father's passport was issued in 2019, and the IJ said, well, if he didn't have contact, how did he get the passport? Mr. Saeed testified that his brother paid money and was able to obtain this. The expert witness at the hearing, who the IJ found credible on this piece, explained that given the vacuum, power vacuum in Yemen, it's complete practice for if you have money and connections, you can get a passport without the person having to be present. Did the agency address this explanation? No. No, no. So that was not, they just said it was implausible. But this court, in its case law, says you can't just say something's implausible. You have to have factual basis for it. And when you have an expert evidence under Valesquez-Samayoa, you either have to accept that expert or explain why that expert's testimony is not relevant. And here, the IJ only discounted the expert evidence as related to country conditions. He never, the IJ or she, never addressed the expert's explanation that there's a power vacuum. The second reason is the father's medical records, where he produced medical records from 2020, showing that, which is consistent with his father having a stroke, which is why he went back. And that's a situation where the DHS attorney never challenged that at the hearing. What does the records show about how he got the records? It's never presented, it's never asked, because he was never challenged by it on cross-examination. There was even an exchange when they were going at the end of the hearing, the IJ said, I don't have any problems, any other problems. And so that was, it did not come to his attention until the IJ relied upon it in the hearing, which under SOTO Olarte, there has to be a reason given. So on that reason, at a minimum, there needs to be a remand to allow him to be questioned and provide an explanation. Did you want to save the remainder of your time? Yes, Your Honor. Thank you. Whenever you're ready, Mr. Cochran. Thank you, Your Honor. May it please the Court, Todd Cochran on behalf of the Attorney General. The Court just heard Ms. Holland's numerous speculative arguments, trying to convince that there's a different way of looking at the agency's adverse credibility determination, in hopes the Court will overturn that decision. But as set forth in the Respondent's brief, the agency's adverse credibility determination was based upon Mr. Syed's inconsistent and contradictory statements and evidence, not due to any alleged translation errors. I'd like to clarify the records related to the due process contention and address why translation is not an issue in this matter. Mr. Syed inaccurately claimed in his opening brief that a certified interpreter happened to be in the courtroom at the start of the hearing and tried to notify the IAJ of competency issues. Why don't you just maybe move over to the, for my benefit, the adverse credibility piece of this, because there's some points that Ms. Hong raised that I think you should respond to in terms of this issue about whether he was attacked on the day he arrived back in Yemen or at the home, and also the agency's findings about his account relating to his father. Yes, Your Honor. Well, he did testify that he arrived back in Yemen in November of 2018. That's in the record at 290 to 91, and 316 to 317. As Ms. Hong talked about as well, the incredible fear interview, he says he returned in early 2017 and remained in Yemen for all of 2018. That was at 462 to 463, and in fact, when he was being cross-examined, the DHS attorney was asking him when he returned to Yemen, not when he returned to the family home, and his answer was, the question actually posed at the end of that, the DHS attorney summed that up. He says, your testimony is that you returned in November of 2018, within a few hours that you returned, Houthis took you into custody, correct, Mr. Syed? Yes. So there the DHS attorney was talking on the page before about when he returned to Yemen, not to the family home, asked a summary question, summarizing Mr. Syed's testimony, and he responded yes, it was within a few hours when he returned back into the country. So can I ask just a follow-up on that, because it does seem like there was some inconsistency between whether it was 2017 or 2018, and he said both. Is there a responsibility for the IJ to try and clarify that on the record and say, hey, because this isn't one thing where he said, I guess my question is, doesn't he get the opportunity, shouldn't he be given the opportunity to clarify what he meant, if he misspoke when he said 2017? Yeah, if he misspoke, yes, of course he'd have an opportunity to clarify that. As I started out talking before, Judge Brass had a different question. He did it at the benefit of three lawyers from the internationally recognized law firm and his own personal interpreter assisting him during the IJ hearing. So if he had any issues, and he had to clarify his testimony, he's only going to have constant responsibility for that. Doesn't the IJ bear some responsibility when two different dates are given to say which one are you saying? Or just once two dates are given, it's game over, and you can find adverse credibility? I think the IJ does have some responsibility to control the courtroom, to control the testimony, yes, Your Honor. But again, I think Mr. Syed had multiple attorneys at his disposal that if it was unclear about what he was testifying about, redirect. Wait, this seems like this is a simple question. If an inconsistency is given, does the IJ have a responsibility to ask for clarification? And if he doesn't, is that error in the adverse credibility finding? That is either true or that's not true. I don't think it's error, particularly when the individual is not proceeding pro se. The IJ has a responsibility to control the courtroom, orderly testimony, but when he has counsel prepping him and preparing him and enlisting his testimony, I think that obligation to present clear testimony would fall upon his representation more so than the IJ. But you think it was, so your position is where that the wash either is or should be that when the immigrant is, when the alien is represented by counsel, it's his burden to clarify the testimony. It's not the IJ's responsibility to give an opportunity on the record to clarify inconsistencies. He has an opportunity on the record to clarify, yes, he could have prepped the business attorney and it's ultimately the non-citizen's burden to prove their eligibility, which in this instance goes to whether he provided credible testimony. There must be case law on this. Do you have case law that supports that position? I don't know off the top of my head, Your Honor. I'm certainly happy to submit something after the fact. I don't, I don't find that answer to be really persuasive. The problem is when you are testifying through the use of interpreters, lots and lots of confusion are created in the record. And I'm sure you've seen this in many, many, many immigration proceedings where the questions weren't translated quite properly. The IJ's asking one thing or the government counsel's asking one thing, but the applicant answers something a little bit different. And that seems to be the case to me in this particular case, both with regard to the timing of when he returned to Yemen. It wasn't clear was he then detained within hours of his arrival at his home or hours of his arrival in Yemen. That part was not clear. And this is where I think the case law is clear that the IJ has to clarify that record before relying on it. Same for the testimony regarding the father, you know, whether you can obtain a passport without being present, like who got the medical records, when, isn't it incumbent upon the IJ to make sure that the record is clear before relying on it to make an adverse credibility determination? I mean, yes, I do think the IJ does have an obligation to make sure the testimony is clear. I think that responsibility is also borne by Mr. Syed to prove his ultimate claim and he had representation in that scenario there. I will point out as far as I agree with Your Honor that there are always going to be slight translation errors when you're translating from one language to another. And you're right. I have seen that in many, many cases. I think every case probably has that, but he has to show that any mistranslation was significant here to the point that he was prejudiced. And there's many cases from this court showing that, you know, if he has incomplete testimony, unless he has difficulty answering the questions where it goes to minor details like Ms. Hong brought up about... It was prejudiced. It was prejudiced because he was found not credible. Well, that's... Shouldn't we at least send it back for clarification of the record? I think... I'm sorry. Are we going to repeat that question? Shouldn't we at least send it back for clarification of the record? I don't think the court needs to do that because I don't think he was prejudiced here. I think he gave testimony at the credible fear interview. He then gave testimony at the... In the sitting court hearing, the immigration judge rightfully compared the two and there were discrepancies. Yeah, but let's just... I mean, let's walk through them in some granularity because I think when you do that, you do see how the findings that we're talking about were really the linchpins of the BIA decision, right? To start with the issue of when he returned to Yemen and when he was apprehended, there the IJ and BIA took him to be saying the day he got back to that country, he was taken. And if true, that does seem like an inconsistency as compared to what he had said before in the sense that he had never presented this dramatic story. However, if you look at his testimony, that's not at all clear that's what he meant. And there's no effort to try to work through that difference. The date in and of itself, you know, 2017 versus 2018 is not particular material. What is material is what allegedly happened in 2018 and that seems somewhat unclear. I agree, Your Honor, that the state discrepancy isn't a big one. But it was a discrepancy of the immigration judge seized upon as differing testimony from what he said with the credible fear interview where he had interpretation in counsel. Right, but that's depending on an interpretation of what he meant in the IJ proceedings. And there, I don't think he's been given the opportunity to explain this, even assuming there is an inconsistency on this point. Okay. Again, I point back to 316 to 317 where the DHS attorney was talking about when he returned to Yemen, summarize and one says his testimony and he said, yes, that's what we decided to in our brain. And that's what we feel supports that point, Your Honor. Can I ask about the demeanor issues? Because I hadn't fully expected the answer that we got from petitioner's counsel that in her opinion, the BIA did not rely on that at all. Do you agree with that? As I read it, it's not implied that that interpretation is not implausible. I mean, it just repeats, I'm reading from AR5, the immigration judge based her adverse credibility finding on specific and cogent reasons. Maybe that's what you'll rely on, including inconsistencies between the respondent's testimony and documentary evidence, implausible testimony, the respondent's demeanor and his vague and evasive responses. You think that that statement is enough whereby the BIA adopted those reasons from the IJ about demeanor and evasive responses? Your Honor, I confess, I actually concur with Ms. Hong on that. We did not read that as a demeanor finding. We simply relied upon the documentary and testimonial inconsistencies as the basis for the agency's adverse credibility finding, not so much the demeanor. The IJ, I agree, made a demeanor finding. You don't think the BIA, so you don't, okay, so you don't think we're reviewing the demeanor findings? No, I do not, Your Honor. Okay. How about the finding about how he got his passport at the end? Is that a finding that's before us? That was not one that we defended, Your Honor. We talked about, well, we were not concerned with that one, so no, to answer your question directly, the government, depending on the board decision, looking at when he went to Saudi Arabia and returned to Yemen, when he was obtained by the Houthis upon arrival back in Yemen, and then the no contact with his father question, which he, I think Your Honor talked about. He said he left in 2014, had not seen his father since, that was a 2-8-8-9 and 3-15-3-16. His father was still in Houthi custody in an unknown location, but he returned in 2018 to see his father, despite not knowing where he was, and then he had documents in the record. He had his asylum application from 2021 that was prepared with counsel that said his father was now a farmer, and that's at page 1148. We weren't sure how he would know that if he had not had contact, and then the 2019 passport and 2020 medical records at 435 and 441. Was he asked to explain this issue of, you know, how do you have these documents, the contact with the father? I believe he was, Your Honor. I don't believe he provided an answer to that other than the passport speculation about how his brother might have got it. How about the medical records? Was he ever asked how he obtained the medical records or say how he did? I don't think he was. I think he was asked generally, how did you get these documents about your father? But there was no answer given as to how he had that. It just doesn't seem, again, you know, the idea that just because he has these documents that means he had contact with the father, that could be true. But I don't necessarily know what in the record would support that. Well, Your Honor, I appreciate that. We do feel that that does support the average credibility finding, particularly when you look at the substantial evidence in a review that applies in this case. And unless Mr. Saad can show that the evidence compels a different conclusion with the agency found, the decision must be affirmed. Can I ask a question? So the Ollam case, we went on, prior to Ollam, as you likely know, in this court, the law was if you have, you know, if there's five bases for the adverse credibility, even if one of them stands, you've got to uphold it. Here, now post-Ollam, we've changed that. We've said totality of the circumstances. If we were to only agree with you that there was some inconsistency between the 2017 and the 2018 date, don't you think that under Ollam, we'd still need to send it back? Or you would say that is enough to uphold this, even after Ollam, as a basis to uphold the adverse credibility finding? Your Honor, I would say that is enough. And I point the court to its Kahloulen case that we fought a 28-J on a couple of months ago. In that case, I think there were 12 inconsistencies in that case, including a demeanor finding, and the agency upheld four of those. And this court found that that was sufficient under the totality of the circumstances to find the adverse credibility decision to be upheld by the board. The board's decisions, pardon me. You've got a little over a minute left. Would you like to yield the rest of your time? Unless the court has any further questions, the government will rest on its brief. Thank you, Your Honor. All right, thank you. All right, thank you. Thank you. I have two points. One, in answer to your question, Judge Wynn, the two authorities are Soto Olarte, which is at page 32 of Petitioner's brief, where it says, we remand on an open record to give the agency an opportunity to evaluate his credibility while allowing him to explain as yet unexplained inconsistencies. And at page 11 of the reply brief, we have Perez Acero v. Lynch, where, quote, the inconsistency with his I-213 cannot support a negative credibility finding because the IJ did not ask Antonio about the inconsistency. So those are the two precedents. So you think the proper remedy here is a remand for the adverse credibility issue to be further explored? Yes. If the court agrees on the adverse credibility, and there is no longer a single factor rule, that goes to your question. If the court agrees that any of them are not held, remand should be on that basis. The government or the court also agrees— Our law doesn't demand that, though, right? I mean, you would agree that even if we—if there are four bases and we found, you know, only three of them supported, we wouldn't need to remand under that scenario. Well, without that hypothetical here, Alam says that, I mean, if you scrub one and I think definitely the two, speculation, it has to be remanded because a single factor rule cannot uphold an adverse credibility to let the IJ, especially on this context, to realize with the interpretation problems that there might be tainted reasons for the other reasons given. Back to your question, Judge Bress. If the court also agrees on the due process, remand for a new hearing would be required if any of the three errors. And the Nawan-Dinobi case is the best case that gives the pathway for the court to follow on balancing those two issues. All right. Thank you very much, counsel, to both sides of your argument. The matter is submitted.
judges: NGUYEN, NELSON, BRESS